IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBIN GREEN,                          §
                                      §
        Plaintiff,                    §
                                      §
v.                                    §        CIVIL NO. 10-CV-01075
                                      §
MICHAEL J. ASTRUE,                    §
COMMISSIONER OF THE                   §
SOCIAL SECURITY ADMINISTRATION,       §
                                      §
        Defendant.                    §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] is Plaintiff's Second Amended Motion for Summary Judgment (Doc. 24) and Defendant's response requesting that the decision of the Commissioner of the Social Security Administration ("Commissioner") be affirmed.  The court has considered Plaintiff's motion, Defendant's response, all relevant filings, and the applicable law.  For reasons set forth below, the court **DENIES** Plaintiff's motion and **AFFIRMS** the Commissioner's decision.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner regarding Plaintiff's claim for disability benefits under Title II and Title XVI of the Social Security Act ("the Act").

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docs. 11-12.

## A.  Factual History

### 1.  Age, Education and Work Experience

Plaintiff was born on March 7, 1955, and was fifty-two years old on November 6, 2007, the date of the alleged onset of disability.[2]  Plaintiff completed high school, received a Bachelor of Science degree from a four-year institution and received two master's degrees.[3]  Prior to her alleged onset of disability, Plaintiff worked as a health educator, nutritionist, census enumerator, print specialist, cook, and teacher's aide.[4]

### 2.  Medical Record

The record provides varying degrees of support for Plaintiff's claims of physical ailments that include back pain, leg pain, carpal tunnel syndrome, headaches, and obesity.[5]  The record generally supports Plaintiff's claims of depression and anxiety.[6]

#### a.  Back Pain and Leg Pain

On July 7, 2005, Plaintiff was admitted to the hospital for low back and knee pain.[7]  Plaintiff was discharged after being prescribed ibuprofen and Vicodin and given a knee brace for leg

---

[2]    See Transcript of the Administrative Proceedings ("Tr.") 129.

[3]    See Tr. 497-98, 500-01.

[4]    See Tr. 153.

[5]    See Tr. 52, 56-58.

[6]    See Tr. 82, 84.

[7]    See Tr. 221.

stability.[8]

On June 12, 2006, Plaintiff was admitted to the hospital for left-side hemiparesis after complaining of pain, numbness, and soreness through the left side of her face and chest, as well as her left arm.[9]  As part of the diagnosing process, Plaintiff underwent computer axial tomography (CAT) scans and magnetic resonance imaging ("MRI") scans to evaluate her head, neck, spine and chest.[10]  The results detailed no intracranial abnormalities, no radiographic lung abnormalities, and no abnormalities of the head or neck.[11]  As a result of a cervical spine (C-spine) anatomy exam without contrast, however, Plaintiff was diagnosed with an atlantoaxial degenerative change along with mild degenerative disk disease at C5-6 manifested by decreased disk space height.[12]  In addition, a head angiogram with and without contrast identified calcification of the left cavernous internal carotid artery that suggested a potential cause of the left side weakness and numbness of which Plaintiff complained.[13]

On May 9, 2007, Plaintiff saw Shelley Manning, M.D., ("Dr.

---

[8]   See Tr. 222.

[9]   See Tr. 227.

[10]   See Tr. 239-43.

[11]   See id.

[12]   See Tr. 244.

[13]   See Tr. 245.

Manning") because of anxiety and back pain.[14]  No medical cause  was found for her back pain and she was prescribed Paxil.[15]

On July 3, 2007, Plaintiff visited Heather Goodman, M.D., ("Dr. Goodman") in large part because of her anxiety, but also due to her back pain.[16]  She was partially diagnosed with nonspecific pain, although no medical cause was established.[17]

On August 9, 2007, Plaintiff visited Gilo Kawasaki, M.D.,[18] ("Dr. Kawasaki") complaining of lower back and suprapubic pain that had been increasing for the past month.[19]  Plaintiff was noted as having mild lumbar tenderness, with no crepitations of the bony spine or palpable deformities.[20]   Again, no medical cause was established, but she was prescribed Bactrim for her suprapubic pain and Naproxen for her lower back pain.[21]

On December 12, 2007, Plaintiff saw Robert Okpara, M.D., ("Dr. Okpara") because of muscle tightness in her pelvic area and thighs

---

[14]    See Tr. 266.

[15]    See id.

[16]    See Tr. 264.

[17]    See Tr. 265.

[18]    See Tr. 263.  The record did not specifically indicate whether Dr. Kawasaki was an M.D., but the court infers from the circumstances that he was.

[19]    See id.

[20]    See Tr. 264.

[21]    See id.

and severe pain in her legs.[22]  Dr. Okpara diagnosed Plaintiff with anxiety, pain in her joints of the pelvic region and thigh, and obesity.[23]  Again, on January 22, 2008, Plaintiff saw Dr. Okpara complaining of pain in her arms, back, and legs.[24]  Dr. Okpara diagnosed Plaintiff with fibromyalgia, although the report indicates that Plaintiff suggested having been previously diagnosed with it.[25]

On January 8, 2008, Plaintiff visited Dr. Goodman due to the pain in her legs, specifically in her left leg.[26]  Plaintiff discussed the possibility of fibromyalgia, but this was not verified by Dr. Goodman.[27]

On February 29, 2008, Plaintiff was assessed by A. Rashad Cheema, M.D., ("Dr. Cheema"), regarding anxiety/depression along with lower back and leg pain that had affected her over the past seven-to-eight months.[28]  Dr. Cheema found Plaintiff to "have more psychiatric problems than any physical ailment."[29]  In addition, he found no evidence of tenderness in Plaintiff's legs and noted "full

---

[22]  See Tr. 261.

[23]  See Tr. 262.

[24]  See Tr. 280.

[25]  See Tr. 280-81.

[26]  See Tr. 261.

[27]  See id.

[28]  See Tr. 287.

[29]  Tr. 288.

range of motion of all joints" in her extremities.[30]   Further, Plaintiff could sit, stand, move about, lift, carry, handle objects, walk without a limp, hear, and speak without difficulty.[31] Dr. Cheema concluded that there was no reason to believe Plaintiff had fibromyalgia.[32]

### b.  Carpal Tunnel Syndrome

Plaintiff consulted Floyd E. Luckett, III, M.D., ("Dr. Luckett") beginning July 7, 2003, complaining of left arm pain and numbness.[33] Dr. Luckett's initial assessment was that Plaintiff had carpal tunnel and arm pain and stress.[34]   He advised "nerve conduction velocities" be performed and referred Plaintiff to a neurologist.[35]   No supporting medical evidence was submitted to verify this diagnosis.  Two days later, on July 9, 2003, Plaintiff attended follow-up visit with Dr. Luckett.[36] All of her laboratory results were normal, and there was no weakness noted.[37] Plaintiff was diagnosed with neuropathy and prescribed Flexeril and Paxil.[38]

---

[30]    See Tr. 288.

[31]    See id.

[32]    See id.

[33]    See Tr. 249.

[34]    See id.

[35]    See id.

[36]    See Tr. 250.

[37]    See id.

[38]    See id.

6

On July 18, 2003, Plaintiff returned to see Dr. Luckett who noted that the polyneuropathy study was not ready and planned a follow-up visit in two weeks.[39]  Later, on August 5, 2003, Plaintiff made this follow-up visit to learn of the test results.[40]  At that time, Dr. Luckett assessed Plaintiff as having carpal tunnel syndrome and referred her to a hand specialist.[41]  There is no evidence in the record that Plaintiff sought treatment from a hand specialist.

As noted above, Plaintiff was admitted to hospital on June 12, 2006, for numbness in her hands, face and arms.[42]  As a result of the x-ray computed tomography scans ("CT scans") that were performed by Adam Blanchette, M.D., ("Dr. Blanchette"), Plaintiff's principal diagnosis was carpal tunnel sensory neuropathy and she was instructed to return to the ER if she had any worsening of her symptoms.[43]  There is no corresponding medical evidence of an additional visit due to these symptoms.

### c.  Obesity and Headaches

On August 3, 2006, and October 10, 2006, Plaintiff was

---

[39]    See Tr. 252.

[40]    See id.

[41]    See id.

[42]    See Tr. 230.

[43]    See Tr. 230-31.

diagnosed, in part, with obesity.[44]  On November 9, 2007, Dr. Luckett advised Plaintiff to begin exercising regularly.[45]  On November 30, 2007, at the first Disability Field Office Report, Plaintiff was five-feet four inches tall and weighed 240 pounds.[46] When Plaintiff testified to the ALJ on April 2, 2009, she stated that she then weighed 263 pounds.[47]

Regarding Plaintiff's complaint of headaches, there is no medical evidence to suggest that she sought medical treatment for any headache-related issues.  According to the record, the first time she complained of severe headaches was in her testimony before the ALJ when she noted that she would awake with severe headaches.[48] There is nothing in the medical record to indicate treatment for migraines or other significant head pain.

### d.  Mental and Emotional Ailments

#### I.  Mental assessments from treating physicians

On July 3, 2007, Plaintiff visited Dr. Goodman complaining of anxiety and poor concentration.[49] Dr. Goodman assessed that she had a good mood, was suffering from anxiety disorder and had a GAF

---

[44]     See Tr. 256, 258.

[45]     See Tr. 254.

[46]     Tr. 145.

[47]     Tr. 56.

[48]     See Tr. 43.

[49]     See Tr. 265.

measurement of 65.[50]

On December 11, 2007, Plaintiff returned to Dr. Goodman complaining of depression.[51] Dr. Goodman diagnosed Plaintiff with panic and depressive disorders and noted a GAF measurement of 60.[52] On January 8, 2008, Plaintiff returned to Dr. Goodman, and her depression was noted as having improved.[53] Specifically, Plaintiff was not crying as much and had "the desire to get up and do things around the house."[54] Plaintiff was diagnosed with panic disorder, depression, chronic pain and a GAF measurement of 60.[55]

On November 11, 2009, Plaintiff saw Dr. Luckett complaining of tension, difficulty relaxing, tachycardia-palpitations and dyspnea.[56] Dr. Luckett diagnosed her with anxiety syndrome, advised her to avoid caffeine, and suggested regular physical activity and prescribed Xanax and Lexapro.[57]

## ii.  Evaluations from psychiatrists

On February 11, 2008, Sarah Jackson, Ph.D., ("Dr. Jackson") conducted a psychiatric review of Plaintiff, specifically based

---

[50]    See id.

[51]    See Tr. 263.

[52]    See id.

[53]    See Tr. 261.

[54]    See id.

[55]    See id.

[56]    See Tr. 254.

[57]    See id.

upon Plaintiff's condition from November 6, 2007, through February 11, 2008.[58] After reviewing many of the pertinent medical files and examining Plaintiff, Dr. Jackson determined that Plaintiff had major depressive disorder and anxiety disorder.[59] As a result, Dr. Jackson determined that Plaintiff was mildly limited in her restriction of activities of daily living, moderately restricted with difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace, and not limited with regard to episodes of decompensation, each of extended duration.[60] Furthermore, Dr. Jackson noted that the "[e]vidence does not establish the presence of the 'C' criteria," which includes schizophrenia, chronic organic mental and affective disorder.[61]  Dr. Jackson concluded:

> [Plaintiff] can understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine setting. [Plaintiff's] alleged limitations are not fully supported by EOR,[62] therefore are not wholly credible.[63]

In addition, Plaintiff solicited a psychological evaluation on

---

[58]    See Tr. 295.

[59]    See Tr. 298, 300.

[60]    See Tr. 305.

[61]    See Tr. 306.

[62]    See Tr. 311.  "EOR" was interpreted by the court to indicate "evidence on record."

[63]    See id.

April 17, 2009, from Eva Stubits, Ph.D., ("Dr. Stubits").[64] Plaintiff reported the following symptoms: "poor concentration, memory lapses, bouts of fatigue, crying spells, self-isolation, insomnia, fluctuating appetite, irritability, and auditory hallucinations."[65] Dr. Stubits observed that Plaintiff's "speech was designed to emphasize her degree of disability," that she appeared to have no difficulty comprehending the language and that her speech was fluid, spontaneous and coherent.[66] Dr. Stubits concluded that Plaintiff had major depressive disorder with psychotic features per Plaintiff's self-report and a current GAF measurement of 55.[67]

On March 6, 2008, Plaintiff consulted Kathy Scott-Gurnell, M.D., ("Dr. Scott-Gurnell") because of her anxiety, who noted that Plaintiff was "alert and oriented to person, place, time and situation."[68] Her speech, however, was very slow and anxious, with a tremor in her voice.[69] Dr. Scott-Gurnell diagnosed Plaintiff with major depressive and anxiety disorder, fibromyalgia and obesity, and assessed her with a GAF measurement of 39.[70]

---

[64]    See Tr. 533.

[65]    See id.

[66]    See Tr. 535.

[67]    See Tr. 537.

[68]    Tr. 291.

[69]    See Tr. 292.

[70]    See Tr. 293.

**B.  Procedural History**

    **1.  Disability Application**

Plaintiff filed for disability benefits on November 30, 2007, alleging disability since November 6, 2007.[71]  In connection with her application, Plaintiff completed several questionnaires in which she described her daily activities and reasons for disability.[72]

On December 17, 2007, Plaintiff completed a Daily Activity Questionnaire detailing her daily activities and the limiting issues giving rise to her claim.[73]  In this Questionnaire, Plaintiff noted that she was having mental or emotional problems that limited her ability to work with groups, speak clearly, relate her thoughts and get out of bed and leave home.[74]  Plaintiff reported that she spent most of the day sitting due to her physical problems.[75]  Further, Plaintiff stated that she could not get in the tub alone and would get frustrated picking out her own clothes, often resulting in anxiety attacks.[76]  According to the questionnaire, Plaintiff went to the doctor weekly and attended church about once

---

[71]    See Tr. 142.

[72]    See Tr. 165-80.

[73]    See Tr. 165-69.

[74]    See Tr. 165.

[75]    See Tr. 166.

[76]    See id.

per week, but she needed to be in an uncrowded pew.[77]  Plaintiff noted that she had problems making decisions and handling changes to her daily routine, causing her to cry and scream.[78]

Plaintiff filled out a second Daily Activity Questionnaire on January 4, 2008, detailing her physical problems.[79]  She complained of severe back and leg pain that prevented her from sitting, standing up or lying down for extended periods of time.[80]   Though she noted that her physical problems persisted "24-7," taking medication, stretching, soaking and switching positions made her physical problems better.[81]  Plaintiff described most activities as limited by her physical problems, such as sitting, standing, walking, lifting, kneeling, speaking, driving a car and kneeling/squatting.[82]  Plaintiff described "[u]sing your hands" and "[w]atching tv" as not having been limited by her physical problems.[83]

On April 3, 2008, Plaintiff completed a third Daily Activity Questionnaire.[84]   In it, she complained of fibromyalgia, chronic

---

[77]     See Tr. 168.

[78]     See id.

[79]     See Tr. 170.

[80]     See id.

[81]     See id.

[82]     See Tr. 171.

[83]     See id.

[84]     See Tr. 173-80.

13

depression, anxiety and referenced her physical problems.[85]
Plaintiff noted that her problems persisted all day, every day and
that, though she went to the doctor, took medication and exercised
in bed and in a chair, these remedies provided very little relief.[86]
Plaintiff described her daily activities as mainly sitting in bed,
waiting for someone to take care of her by bringing her food,
taking her to the restroom and helping her dress and bathe.[87]
Plaintiff noted that she could not drive, although her husband took
her to church two-to-three times per month.[88] She was not able to
focus for more than five minutes and could not handle changes to
her daily routine.[89] In this questionnaire, Plaintiff checked that
all previously noted activities were limited due to her physical
problems and added that watching television was inhibited because
it made her nervous.[90] Plaintiff again checked, however, that the
use of her hands was not limited by her physical problems, writing
"still fair" to describe this category.[91]

    In addition to filling out Daily Activity Questionnaires,

---

[85]    See Tr. 173, 178.

[86]    See Tr. 178.

[87]    See Tr. 174, 179.

[88]    See Tr. 176, 178.

[89]    See Tr. 176.

[90]    See Tr. 179.

[91]    See id.

14

Plaintiff completed three Disability Reports.[92]  The first was conducted via telephone on November 30, 2007.[93]  Plaintiff was noted as being five-feet, four inches tall and 240 pounds.[94]  The interviewer concluded that Plaintiff did not have difficulty hearing, reading, breathing, understanding, concentrating, talking, answering and that there were no difficulties associated with her coherency.[95]  Plaintiff stated that the conditions that limited her ability to work were mental, specifically citing her anxiety attacks.[96]  In addition, she detailed that her condition first interfered with her ability to work on November 6, 2007, and explained that this was when she became unable to work.[97]  Plaintiff noted that she was not working per a doctor's order.[98]  In describing her previous occupation as a self-employed health educator, Plaintiff stated that she walked and stood for four hours each day, sat for two, climbed and crouched for one and stooped down for forty-five minutes.[99]  In addition, Plaintiff testified

---

[92]     See Tr. 142-52, 181-90, 192-201.

[93]     See Tr. 143.

[94]     See Tr. 145.

[95]     See Tr. 143.

[96]     See Tr. 146.

[97]     See id.

[98]     See id.

[99]     See Tr. 147.

15

that she frequently lifted twenty-five pounds.[100]

On April 2, 2008, a second Disability Report was filed.[101] Plaintiff wrote that she had a mass in her back and on her left leg and was no longer able to cook or take care of her personal needs.[102]  In addition, Plaintiff described her anxiety attacks, depression, fatigue and pain as having increased.[103]  Plaintiff approximated the date of these changes as January 1, 2008.[104] Unlike in the previous Disability Report, the interviewer noted Plaintiff as having difficulty concentrating, talking, standing and walking.[105]

Later, another Disability Report was filed.[106]  At this time, Plaintiff described her pain, anxiety and depression as worse than previously stated.[107]  Plaintiff approximated the date of these changes as May 1, 2008.[108]  In addition, she noted that she had new mental and physical limitations in the way of a speech impairment,

---

[100]    See id.

[101]    See Tr. 181-90.

[102]    See Tr. 181.

[103]    See id.

[104]    See id.

[105]    See Tr. 189.

[106]    See Tr. 192-201.  The date of the report is not specified.  See id.

[107]    See Tr. 196.

[108]    See id.

16

which approximately began on May 1, 2008.[109]

The Commissioner denied Plaintiff's application at the initial and reconsideration levels on March 30, 2008, and May 22, 2008.[110] Plaintiff then requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.  The ALJ granted Plaintiff's request and conducted a hearing in Houston, Texas, on April 2, 2009.[111]

**2.  Hearing Before the ALJ**

At the hearing, Plaintiff, Plaintiff's husband, Mr. Jerry Green, Jr., ("Mr. Green"), Plaintiff's sister, Ms. Sandra Sands, ("Ms. Sands") and a vocational expert ("VE"), Wallace Stanfill, testified.

**a.  Plaintiff's Testimony**

Upon being questioned by the ALJ, Plaintiff responded that she had not worked since October 2007 and that she had most recently been a program director for the Houston branch of the NAACP for six years.[112]  In addition, Plaintiff detailed her previous work experience at a family restaurant and as an enumerator with the U.S. Census Bureau.[113]

Plaintiff then described her medical problems as, "Anxiety

---

[109]    See id.

[110]    See Tr. 88, 96.

[111]    See Tr. 108.

[112]    See Tr. 39.

[113]    See id.

attacks . . . depression and . . . a hard time conveying [her] thoughts."[114] She also stated that she had problems with her memory and difficulty focusing.[115] Plaintiff said that she began to have problems when her mother passed away and that she first saw a psychiatrist and took medication for her mental condition in 1998.[116] Further, Plaintiff noted that she had not been taking Zoloft (a medication for her depression) consistently due to her limited resources.[117]

After being asked about other medical conditions, Plaintiff answered that she had severe pain in her lower back.[118] She explained that it started about one year prior to the hearing and that she was taking Flexeril and Hydrocodone for it.[119] Further, Plaintiff could not identify any specific accident as the cause of the back pain and said that she had not been treated for it or had any doctor recommended any kind of corrective surgery for it.[120] Plaintiff testified that she could only sit for thirty or forty minutes because her legs became numb.[121] Additionally, she stated

---

[114]    Tr. 40.

[115]    Id.

[116]    Id.

[117]    See Tr. 41.

[118]    See Tr. 42.

[119]    See id.

[120]    See id.

[121]    See id.

that she could not lift very much, that she could only walk six or seven feet and that she could only stand for a couple of minutes.[122]

Thereafter, Plaintiff described her typical day, noting that she usually woke up around four a.m. with a severe headache and lay there waiting for her husband to retrieve something to remedy it.[123] Plaintiff stated that she was unable to independently get herself out of bed, prepare food, or go to the restroom.[124] Additionally, her husband had stopped working because he needed to be there to support her and their income came from the public assistance that two of the children in her care received for their disabilities.[125] Plaintiff stated that she attended church and that, although she was ordinarily unable to attend her children's activities, she was able to go on at least one occasion.[126]  Further, Plaintiff indicated that she knew how to operate a computer.[127]  Plaintiff also stated that she had not driven a car since March 7, 2009.[128] On that date, Plaintiff was driving when she got into an accident after picking up her nephew at church.[129]  In response to why

---

[122]    See Tr. 43.

[123]    See id.

[124]    See id.

[125]    See Tr. 44.

[126]    See Tr. 46.

[127]    See id.

[128]    See Tr. 44.

[129]    See Tr. 60.

Plaintiff thought that she could not do some kind of work activity, Plaintiff cited a time when she tried to do volunteer work, but was unable because she could not sit for long periods of time or be in a room with many strangers.[130]

During Plaintiff's attorney's questioning, Plaintiff responded that she had missed about four-to-five days per month towards the end of her tenure with the NAACP due to anxiety attacks and depression.[131]  She further described her anxiety attacks as eliciting cries, screams, shortness of breath and a feeling of dying.[132]  Additionally, Plaintiff detailed her defensiveness and fears that other employees were talking about her, causing her to have difficulty interacting with them.[133]  Plaintiff also noted that the side effects of her medications caused her to become sleepy, drowsy, disoriented and have a dry mouth.[134]  Plaintiff elaborated that the side effects from the medications required her to lie down for at least two-to-three hours per day.[135]

Plaintiff then responded to questions regarding her hands, stating that she still had problems with them at the time of her

---

[130]   See Tr. 47.

[131]   See Tr. 50-1.

[132]   See Tr. 51.

[133]   See Tr. 52.

[134]   See Tr. 54.

[135]   See id.

testimony.[136]   Further, she stated that she underwent surgeries on both hands in 2002 or 2003 for carpal tunnel syndrome and that, though she returned to work after these operations, she continued to have problems with her hands.[137]

Plaintiff explained that the CT scans that she had on her head were an attempt to identify why she had no feeling in her left leg and in her lower back, as well as a cause for her severe headaches.[138]   She further explained that she had weakness on the right-side of her body and numbness on the left side of her body.[139]   Plaintiff had not received an explanation as to why she was having headaches,[140] but her anxiety attacks had worsened over time.[141]

### b.  Mr. Green's Testimony

Plaintiff's husband, Mr. Green, was questioned by Plaintiff's attorney.[142]   Upon being questioned, Mr. Green testified that he had been unemployed for about a year at the time of the hearing.[143]   He explained that he left his job due to problems from Plaintiff calling him at work, sometimes two or three times a week, out of

---

[136]   See Tr. 56.

[137]   See Tr. 57.

[138]   See Tr. 58.

[139]   See id.

[140]   See Tr. 59.

[141]   See id.

[142]   See Tr. 63.

[143]   See Tr. 64.

panic that the walls were "closing up" and other similar things.[144]
He further stated that he had to leave his job about twelve times
per month in order to go home and care for his wife.[145]   In
addition, Mr. Green reported that Plaintiff claimed her medication
was not helping her.[146]  While at home after quitting his job, Mr.
Green stated, his wife had about two to three anxiety attacks per
week, consisting of crying, yelling and shaking.[147]

### c.  Ms. Sands' Testimony

Under questioning from Plaintiff's attorney, Ms. Sands
explained that she was Plaintiff's sister and was sixty years old
at the time of testimony.[148]  Ms. Sands lived in Virginia from 1998
until 2007.[149]  She stated that she began to notice a change in
Plaintiff around 2003 or 2004, noting that Plaintiff did not sound
lucid and then she started having panic attacks.[150]  Additionally,
there were times when Plaintiff called Ms. Sands because Plaintiff
was having anxiety attacks about being lost.[151]  On one specific

---

[144]  See Tr. 65.

[145]  See id.

[146]  See id.

[147]  See Tr. 66.

[148]  See Tr. 69.

[149]  See Tr. 70.

[150]  See Tr. 71.

[151]  See Tr. 72.

occasion, Plaintiff was actually within one block from her house.[152]

### d.  Ms. Wright's Statement

In support of Plaintiff, her former supervisor at the NAACP, Ms. Sharonda Wright ("Ms. Wright"), submitted a statement on April 2, 2009.[153]  In it, Ms. Wright stated that she witnessed Plaintiff have two anxiety attacks in the six years that Plaintiff worked under Ms. Wright's supervision.[154]  In addition, Ms. Wright stated that Plaintiff appeared to have a depressed mood and lack of concentration, that she had problems communicating with other employees, and that Ms. Wright began receiving phone calls about Plaintiff's behavior.[155]  Ms. Wright wrote that she advised Plaintiff to seek professional help for her mental issues and that, after having done so, Plaintiff received a medical discharge.[156]

### e.  VE's Testimony

Next, the ALJ asked the VE to categorize Plaintiff's past relevant work with respect to exertional demands and skill requirements.[157]  The VE testified that Plaintiff's most recent occupation was as a community health specialist, which he

---

[152]    See id.

[153]    See Tr. 524.

[154]    See id.

[155]    See id.

[156]    See id.

[157]    See Tr. 75.

23

classified as a light, skilled occupation.[158]  Plaintiff's job as a
school nutritionist was light and skilled; her job as a census
enumerator was light and unskilled; her job as a census field
supervisor was light and semi-skilled; her job as a photocopy
attendant was light and semi-skilled; and her job as a hospital
unit clerk was light and semi-skilled.[159]  The VE also testified
that, under Plaintiff's description, all of the above jobs were
performed by Plaintiff at a medium exertional level.[160]

Next, the ALJ asked the VE to assess the working ability of a
hypothetical individual who: was approaching advanced age; had
graduate-work ability in education; had the ability to occasionally
lift twenty pounds or to frequently lift ten pounds; could sit,
stand, or walk for a period of six to eight hours; had unlimited
ability to push and pull; retained gross dexterity; could
occasionally climb stairs; could not climb ladders, ropes,
scaffolds or run; could occasionally bend, stoop, crouch, crawl,
balance, twist and squat; had the ability to get along with others;
could understand detailed instructions; could concentrate on and
perform detailed tasks; could respond and adapt to workplace
changes in supervision in a limited employee and/or limited public
contact setting.[161]  The VE responded that such a person could

---

[158]    See id.

[159]    See id.

[160]    See id.

[161]    See Tr. 76.

perform some of Plaintiff's past work, specifically the work as a unit clerk as customarily performed.[162]   In addition, there were transferrable skills from Plaintiff's past work, specifically: to apply special skills and training; to attend to the needs of specific groups or individuals; to skillfully coordinate eyes, hands and fingers to handle delicate medical instruments; to remain calm and react appropriately to emergency situations; to apply and establish record-keeping procedures; to maintain charts or similar medical records; to coordinate eyes, hands, fingers simultaneously to record figures in ledgers; to operate a calculator, computer terminal or similar keyboard equipment; to know and to apply established record-keeping procedures; to plan, evaluate and supervise the work of others.[163]   According to the VE, those skills would transfer into other types of jobs, such as general office clerk, records clerk and front office clerk.[164]

Next, the ALJ asked the VE to assume the same skills as the person in the above hypothetical description, but to assume only an ability to understand simple instructions, concentrate and perform simple tasks.[165]   The VE responded that none of Plaintiff's past work could be done with this hypothetical skill set, as the only unskilled job was the enumerator and that involved heavy contact

---

[162]   See id.

[163]   See id.

[164]   See Tr. 77.

[165]   See id.

with the public.[166]   Additionally, there were no transferrable skills from this hypothetical.[167]   Despite these limitations, the VE elaborated that this hypothetical person could perform seventy percent of light, unskilled jobs.[168]   These jobs included: mail clerk, with approximately 1,700 in the Houston area and 285,000 nationally; office cleaner, with approximately 2,500 in the Houston area and 380,000 nationally; small product assembler, with 1,100 in the Houston area and 205,000 nationally.[169]

Plaintiff's attorney then asked the VE whether there would be any jobs in the national economy for the individual in the hypothetical above if she were to be absent from work two-to-three days per month.[170]   The VE answered in the negative.[171]

Next, Plaintiff's attorney asked the VE if there would be any jobs in the national economy for the individual in the above hypothetical if that individual were to fail to communicate with co-employees or with supervisors in her place of employment.[172]   The VE answered in the negative.[173]

---

[166]   See Tr. 77-78.

[167]   See Tr. 78.

[168]   See id.

[169]   See id.

[170]   See id.

[171]   See id.

[172]   See Tr. 79.

[173]   See id.

Plaintiff's attorney then asked if the individual in the above hypothetical would be able to perform any jobs in the national economy if she exhibited a lack of concentration to the extent that she could not complete a given task on the job.[174]  The VE answered in the negative.[175]

Next, Plaintiff's attorney asked if there would be any jobs in the national economy for that hypothetical individual if she would have had to lie down one-to-two hours per day during a normal eight-hour workday.[176]  The VE answered in the negative.[177]

Plaintiff's attorney then asked how a person's unpredictable emotional stability would affect her ability to work in the national economy, specifically regarding a person who may cry and/or scream unpredictably and for five minute bursts, two-to-three times per week.[178]  The VE responded that this would not be allowed by most employers.[179]

### 3. Commissioner's Decision

On June 10, 2009, the ALJ issued an unfavorable decision.[180]

---

[174]    See id.

[175]    See id.

[176]    See id.

[177]    See id.

[178]    See id.

[179]    See id.

[180]    See Tr. 28.

In that decision,[181] the ALJ followed the five-step process outlined in the regulations, finding at the first step that Plaintiff met the insured status requirements of the Act through December 31, 2011, and that she had not engaged in substantial gainful activity since her alleged onset date of November 6, 2007.[182] At step two, the ALJ found that Plaintiff suffered from the following severe impairments: affective mood disorder, generalized anxiety disorder, discogenic and degenerative disorders of the spine, obesity and headaches.[183]   However, at step three, the ALJ concluded that Plaintiff's impairment or combination of impairments were not of a severity sufficient to meet or equal one of the medical listings in the regulations ("Listings"),[184] and therefore Plaintiff was not presumptively disabled under the Act.[185]

The ALJ then took into consideration the information contained in the entire record, including Plaintiff's medical records and the testimony presented at the hearing, and found at step four that Plaintiff retained a residual functioning capacity ("RFC") to sit, stand, and walk six hours of an eight-hour day.[186]   The ALJ also

---

[181]   For an explanation of the five-step process, see the standard of review and applicable law section of this memorandum opinion.

[182]   See Tr. 20.

[183]   See id.

[184]   See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[185]   See Tr. 21.

[186]   See Tr. 23.

found that Plaintiff retained an unlimited ability to push and pull within weight limitations and retained unlimited gross and fine dexterity.[187]   Additionally, he found that Plaintiff could not run, but could occasionally bend, stoop, crouch, crawl, balance, twist and squat.[188]   He also found that she was able to get along with others, understand simple instructions and concentrate on and perform simple tasks.[189]   Further, Plaintiff could respond and adapt to workplace changes and supervision in a setting requiring limited contact with other employees and the public.[190]

The ALJ concluded that Plaintiff was unable to perform any past relevant work, but that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform with her limitations.[191]   Accordingly, the ALJ found Plaintiff "not disabled" and denied her claim for a period of disability under Title II and Title XVI of the Act.[192]

Plaintiff appealed the ALJ's unfavorable decision.[193]   On February 5, 2010, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of

---

[187]   See id.

[188]   See id.

[189]   See id.

[190]   See id.

[191]   See Tr. 27.

[192]   See Tr. 28.

[193]   See Tr. 13.

the Commissioner.[194]        Having  exhausted  all  administrative
remedies,[195] Plaintiff brought this civil action for review of the
Commissioner's decision.[196]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner
denying disability benefits is limited to the determination of
whether: 1) substantial evidence in the record supports the
decision; and 2) the ALJ applied proper legal standards in
evaluating the evidence. <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th
Cir. 2002); <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).

## A.  <u>Substantial Evidence</u>

The widely accepted definition of "substantial evidence" is
"that quantum of relevant evidence that a reasonable mind might
accept as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230
F.3d 131, 135 (5th Cir. 2000).  It is "something more than a
scintilla but less than a preponderance." <u>Id.</u> The Commissioner
has the responsibility of deciding any conflict in the evidence.
<u>Id.</u>  If the findings of fact contained in the Commissioner's
decision are supported by substantial record evidence, they are
conclusive, and this court must affirm.  42 U.S.C. § 405(g);

---

[194]    <u>See id.</u>

[195]
    <u>See</u> <u>Harper v. Bowen</u>, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of
the administrative steps a disability claimant must take in order to exhaust her
administrative remedies.

[196]    <u>See</u> Doc. 1, Pl.'s Original Compl.

Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.   Brown, 192 F.3d at 496.   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   Id.

**B.   Legal Standard**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.   Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).   The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any

"substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled"; and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and residual functioning capacity must be considered to determine whether s[he] can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498.  If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff contends that the ALJ's

decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.  Specifically, Plaintiff argues that the ALJ erred in six ways: (1) the ALJ erred in his assessment of Plaintiff's pain; (2) the ALJ erred in his assessment of Plaintiff's credibility; (3) the ALJ failed to consider Plaintiff's ability to sustain work activity; (4) the ALJ erred in the weight he attributed to psychological evaluations; (5) the ALJ failed to evaluate the testimony of the lay witnesses of record; and (6) the ALJ failed to recognize Plaintiff's carpal tunnel syndrome as a severe impairment.[197]

Defendant, on the other hand, contends that the ALJ employed proper legal standards in reviewing the evidence and that the ALJ's decision is supported by substantial evidence of record.[198] Defendant therefore maintains that the ALJ's decision should be affirmed.

**A.  <u>Assessment of severity of Plaintiff's pain</u>**

Plaintiff argues that the ALJ erred in discounting her credibility on the basis of the lack of objective medical evidence for her pain.  The court addresses whether there was substantial evidence for the ALJ to discount the Plaintiff's assertions of pain.

Though the ALJ must consider subjective evidence of nonexertional ailments that may have a disabling effect, such as

---

[197]    Doc. 24, Pl.'s 2d Am. Mot. for Summ. J., p. 4.

[198]    Doc. 25, Def.'s Resp., p. 16.

pain, once a medical impairment is established, "pain constitutes a disabling condition . . . only when 'it is constant, unremitting, and wholly unresponsive to therapeutic treatment.'" <u>Beck v. Barnhart</u>, 205 F. App'x 207, 212 (5th Cir. 2006)(citing <u>Cook v. Heckler</u>, 750 F.2d 391, 395 (5th Cir. 1985)).

Only if the ALJ finds the claimant's testimony credible based on the entire record, must the ALJ fully credit her assertions of pain without supporting medical evidence.   <u>Id.</u>; <u>see generally</u> 20 C.F.R. §§ 404.1520, 416.929.  The ALJ's conclusions regarding the disabling effect of the subjective complaints, such as pain, "are entitled to considerable judicial deference." <u>James v. Bowen</u>, 793 F.2d 702, 706 (5th Cir. 1986).

Here, Plaintiff argues that the ALJ's finding is not supported by substantial evidence because the ALJ failed to properly consider the many documented instances in which she received medical treatment for complaints of pain and/or failed to properly weigh the evidence of fibromyalgia.[199]

Despite Plaintiff's contentions that her back and leg pain was severe,[200] the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause only intermittent pain.[201]  Like the plaintiff in <u>Beck</u>, Plaintiff had subjective complaints of pain related to a medically determinable

---

[199]    <u>See</u> Doc. 24, Pl.'s 2d Am. Mot. for Summ. J., pp. 19-20.

[200]    <u>See</u> Tr. 261.

[201]    <u>See</u> Tr. 24.

condition, to wit, discogenic and degenerative disorders of the spine,[202] but her "subjective complaints and functional limitations [were] not credible or reasonably supported by objective medical evidence."[203]  See Beck, 205 F. App'x. at 210.  For example, the ALJ noted Plaintiff claimed to have only been able to walk six or seven feet, though Dr. Blanchette indicated that her motor examination was 5/5 and Dr. Cheema did not report any physical limitations.[204]  As in Beck, the ALJ's analysis is supported by substantial evidence and satisfies the proper legal standard.  See Beck, 205 F. App'x. at 211.

Turning next to the Plaintiff's claims of fibromyalgia and headaches, the ALJ concluded that these were not supported by objective medical evidence and, thus, did not qualify as disabling.[205]  Like the plaintiff in Owens v. Heckler, Plaintiff contended that the pain suffered was severe.  770 F.2d 1276, 1281 (5th Cir. 1985).  Specifically, Plaintiff argued that she could not get out of bed due to the severity of her headaches, though she had not been diagnosed with or treated for migraines and her MRI and CT scans were negative for any cranial abnormality.[206]

In addition, regarding Plaintiff's alleged fibromyalgia, the

---

[202]    See Tr. 20.

[203]    See Tr. 24.

[204]    See Tr. 230, 287-88.

[205]    See Tr. 25.

[206]    See id.

ALJ relied on the fact that Plaintiff was referred to a rheumatology clinic, but there is no evidence of her receiving treatment, and her test results were negative for any autoimmune impairment.[207]   In addition, Dr. Cheema, on March 5, 2008, determined that Plaintiff did not have fibromyalgia.[208]   Applying Owens, the mere existence of pain is not an automatic ground for obtaining disability benefits and should not take precedence over conflicting medical evidence; thus, the substantial evidence supports the ALJ's conclusion.  See 770 F.2d at 1281.

**B.  <u>The ALJ's assessment of Plaintiff's credibility</u>**

Plaintiff further argues that the ALJ erred in assessing her daily activities, resulting in a flawed RFC analysis.[209]

The ALJ can consider evidence of daily activities in conjunction with other evidence in determining whether Plaintiff is disabled.  See <u>Reyes v. Sullivan</u>, 915 F.2d 151, 155 (5th Cir. 1990).  In addition, inconsistencies between Plaintiff's testimony about her limitations and her daily activities are "quite relevant in evaluating [her] credibility."  <u>Id.</u>

Plaintiff offered a great deal of testimony regarding her limitations, specifically detailing that she could not drive, attend public events, sit for a long time without readjusting or

---

[207]   <u>See</u> <u>id.</u>

[208]   <u>See</u> Tr. 288.

[209]   <u>See</u> Doc. 24, Pl.'s 2d Am. Mot. for Summ. J., p. 20.

36

walk more than six or seven feet.[210]  As in Reyes, the ALJ found significant inconsistencies between the testimony of Plaintiff and further reports of her daily activities.  Specifically, the ALJ found that, contrary to previous testimony indicating that she could not leave her bed or go to public places, Plaintiff attended church weekly and was able to attend at least one school activity.[211] In addition, the record indicates that Plaintiff drove in 2009, despite Plaintiff's statements in 2008 that she could not drive.[212]  Thus, in accordance with Reyes, the ALJ properly relied on this evidence to discount the credibility of Plaintiff's testimony in addressing her limitations.

## C.  The ALJ's assessment of Plaintiff's ability to sustain work

Because Plaintiff argues that the ALJ's RFC finding does not consider Plaintiff's ability to sustain work activity, the court addresses whether the ALJ erred in making this determination while considering the evidence.

To determine that a claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  Carter v. Heckler, 712 F.2d 137, 142 (5th Cir. 1983) (citing Dubose v. Mathews, 545 F.2d 975, 977-978 (5th Cir. 1977)).  Without a showing that the claimant's physical ailments wax and wane in the manifestation of disabling

---

[210]   See Tr. 43, 165-66, 178.

[211]   See Tr. 26.

[212]   See Tr. 44, 179.

symptoms, the claimant's ability to maintain employment is subsumed in the RFC determination.  Perez v. Barnhart, 415 F.3d 457, 465 (5th Cir. 2005).

Here, after weighing the evidence in the record, including the VE's testimony, the ALJ determined that Plaintiff could work certain jobs categorized as light and unskilled.[213]  Like in Perez, the evidence did not require the ALJ to make an independent determination as to whether Plaintiff's impairments would allow her to maintain employment on a sustained basis.

Additionally, like in Perez, the severity of Plaintiff's ailments varied over time, however, this pattern did not rise to the level of impairment necessary to require an independent finding of sustainability.  See 415 F.3d at 465.  Specifically, the ALJ noted that the pain and symptoms that had been reported to be fairly consistent and did not wax and wane to any extreme degree.[214] Plaintiff reported that she was consistently unable to sleep more than three hours a night or for longer than thirty-minute intervals and she noted that the disabling effects of her pain were felt daily.[215]  Plaintiff's symptoms strongly reflected the description in Perez of having "good days and bad days," though, unfortunately, most of her days seemed to include pain.  See Perez, 415 F.3d at 465.  Thus, Plaintiff failed to establish the level of waxing and

---

[213]   See Tr. 27.

[214]   See Tr. 24.

[215]   See id.

waning that requires a separate assessment of sustainability by the ALJ.

**D.  Weight attributed to psychological evaluations**

Plaintiff also argues that the ALJ erred in according the psychological evaluations of Dr. Stubits and Dr. Scott-Gurnell "minimal weight."

Though testimony of a treating physician is generally accorded considerable weight, the ALJ has discretion to attribute less weight, little weight, or even no weight to it with a showing of "good cause." Greenspan, 38 F.3d at 237. Good cause includes "disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence." Id. Furthermore, the "ALJ has the sole responsibility for determining the claimant's disability status." Id. (citing Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

Here, after considering the testimony of Drs. Sullivan, Scott-Gurnell and Stubits, the ALJ assigned minimal weight to the medical testimony of Drs. Stubits and Scott-Gurnell.[216] The ALJ is given discretion to determine the weight given to medical testimony that is unsupported or inconsistent with the evidence. See Greenspan, 38 F.3d at 237. The ALJ noted that, while being examined by Dr. Stubits, Plaintiff's "speech was designed to emphasize her degree

---

[216]   See Tr. 26.

of disability, and that she exhibited delayed attention span and concentration."[217]  This behavior, on which Dr. Stubits' evaluation rested, was contrary to Plaintiff's behavior throughout the rest of the record.[218]

Similarly, the ALJ found Dr. Scott-Gurnell's conclusion that Plaintiff displayed "very impaired functioning" to be inconsistent with the record.[219]  In contrast, Dr. Jackson's notes indicate that Plaintiff was not very impaired and that she could function in many environments.[220]   As with Dr. Stubits, the ALJ noted that Plaintiff's behavior during the evaluations was far more traumatic than the rest of the record indicated, highlighting potential issues with the resulting analysis.[221]  The ALJ correctly noted that Plaintiff "responded to questioning with a slow, tremulous voice" in direct contrast to her fluent speech throughout the record.[222]

Dr. Jackson found Plaintiff able to understand, remember, carry out detailed, but not complex instructions and to respond appropriately to changes in a routine work setting.[223]  Though this conclusion is clearly at odds with those of Drs. Stubits and Scott-

---

[217]   See id.

[218]   See Tr. 25.

[219]   See id.

[220]   See Tr. 311.

[221]   See Tr. 25.

[222]   See id.

[223]   See Tr. 311.

Gurnell, there is substantial evidence that it is supported by the record in its entirety.  The record supports Dr. Jackson's view at many points, most specifically:  Plaintiff had little-to-no difficulty speaking, her initial Disability Reports note that she had no difficulty responding;[224] she was able to participate in social activities, such as attending church;[225] and she consistently demonstrated an ability to comprehend and respond to the instruction from doctors.[226]  Like in <u>Greenspan</u>, the testimony of the doctors is contradictory, and the ALJ's detailed analysis and the medical record demonstrate substantial evidence on which to support his conclusion.  <u>See</u> 38 F.3d at 238.  In this case, the ALJ's conclusion is in accord with Dr. Jackson's and is supported by substantial evidence throughout the record.[227]

**E.  <u>Evaluation of testimony of the lay witnesses of record</u>**

Because Plaintiff has provided the testimony of her husband, sister, and a former supervisor to support her claim of disability, the court addresses whether the ALJ erred in making his determination without making a credibility determination of this evidence.

---

[224]   <u>See</u> Tr. 143.

[225]   <u>See</u> Tr. 168.

[226]   <u>See</u> Tr. 143.

[227]
Plaintiff also argues that the ALJ attempted to interpret raw medical data from psychological evaluations in the record.  The court disagrees, but, regardless, finds sufficient evidence to support the ALJ's assessment that any such interpretation did not prejudice Plaintiff.

An ALJ has the discretion to reject lay person testimony in the absence of supporting objective findings "because the observations of an individual, particularly a lay person, may be colored by sympathy for the affected relative or friend and influenced by that person's exaggeration of [her] limitation." Harrell v. Brown, 862 F.2d 471, 481 (5th Cir. 1998) (finding that, in rejecting the statements of relatives and friends, the ALJ acted within his discretion).

The ALJ did not err when failing to mention specifically the affidavit of Ms. Wright.  Applying Hampton v. Bowen, a case will not be remanded simply when the ALJ fails to use the "magic words." 785 F.2d 1308, 1311 (5th Cir. 1986).  The ALJ stated that his conclusion was based on "careful consideration of the entire record."[228]  In fact, The ALJ's conclusions are supported by the statements made by Ms. Wright, as she indicates that she only witnessed Plaintiff suffer two anxiety attacks in a six year period.[229]  Beyond that, Ms. Wright's affidavit repeated reports from Plaintiff or other sources, without demonstrating a reasonable basis to form an opinion contrary to the ALJ's.[230]

Contrary to Plaintiff's assertion, it is clear that the ALJ considered Plaintiff's other lay witnesses, her sister and her

---

[228]   See Tr. 23.

[229]   See Tr. 524.

[230]   See id.

42

husband, as he cited their testimony in his decision.[231]
Furthermore, in accordance with Harrell, the ALJ has the discretion
to discount the testimony of a lay person because that person is
subject to influence by the plaintiff.  See 862 F.2d at 482.

**F.**   **Assessment of Plaintiff's carpal tunnel syndrome**

Plaintiff argues that the ALJ erred by failing to consider the
severity of her carpal tunnel syndrome in concluding that she was
capable of performing the jobs of small products assembler, office
cleaner and mail clerk, all of which would require the use of her
hands.  Because of this, the court addresses whether the ALJ had
substantial evidence to conclude that Plaintiff was not disabled
from performing the functions associated with these positions.

The ALJ owes a duty to Plaintiff to "develop the record fully
and fairly to ensure that his decision is an informed decision
based on sufficient facts."  Gonzalez v. Barnhart, 51 F. App'x 484
(5th Cir. 2002) (unpublished).  Where a "claimant offers no evidence
contrary to the VE's testimony, the claimant fails to meet his
burden of proof under the fifth step of the disability analysis."
Perez, 415 F.3d at 464.  The Fifth Circuit will not reverse a
decision of the ALJ to fully and fairly develop the record unless
the claimant can show that she was prejudiced by the ALJ's error.
See Gonzalez, 51 F. App'x at 484.

Here, Plaintiff argues that the ALJ failed to account for the

---

[231]    See Tr. 24.

limitations derivative from her carpal tunnel syndrome in
suggesting that she is capable of performing jobs requiring
handling or fingering.[232]  Like the plaintiff in Gonzalez, Plaintiff
presented evidence highlighting symptoms of carpal tunnel syndrome.
See id.  In reviewing the entire record, however, the ALJ correctly
found that there was substantial evidence that Plaintiff's symptoms
had no bearing on her state of disability.  Specifically, Plaintiff
self-reported that "[u]sing your hands" was "still fair" on an
April 3, 2008 disability report.[233]  In addition, Plaintiff checked
the boxes to indicate that her physical problems did not limit the
use of her hands in the aforementioned disability report and in a
January 4, 2008 report.[234]  Most telling is the fact that using her
hands was the only physical activity noted by Plaintiff to not have
been limited in the April 3 report, while "walking," "sitting" and
"watching tv" were checked as having been limited.[235]

Furthermore, Plaintiff's alleged carpal tunnel problems were
in 2003, after which she worked successfully for four years before
the stated onset date of her disability.[236]  Dr. Cheema's assessment
supports this capability as he noted that Plaintiff could "lift,
carry [and] handle objects" and that she had "good bilateral

---

[232]  See Doc. 24, Pl.'s 2d Am. Mot. for Summ. J., pp. 40-42.

[233]  Tr. 179.

[234]  Tr. 171, 179.

[235]  Tr. 179.

[236]  See Tr. 249.

grip."[237]   Plaintiff was referred to a hand specialist as a result of her claimed carpal tunnel syndrome in 2003 by Dr. Luckett and claims to have had an operation, however, there is no evidence in the record of carpal tunnel surgery.[238]   Thus, based on the evidence in the record, the ALJ considered all relevant medical ailments. See Gonzalez, 51 F. App'x at 484.

For the reasons stated above, the court finds Defendant satisfied his burden.   As a result, the ALJ's decision finding Plaintiff not disabled is supported by substantial record evidence. The court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination.   Therefore, the Commissioner's decision should be affirmed.

### IV.   Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion for summary judgment and **AFFIRMS** the Commissioner's decision.

**SIGNED** in Houston, Texas, this 10th day of August, 2011.

Nancy K. Johnson
United States Magistrate Judge

---

[237]   Tr. 288.

[238]   See Tr. 253.

45